In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2940

CLIFTON THURMAN,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF HOMEWOOD, HARRY BOEREMA,
CURT WIEST, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 8950—**James B. Moran**, *Judge.*

ARGUED JANUARY 17, 2006—DECIDED MAY 2, 2006

Before BAUER, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* This case arises out of an incident at a Home Depot in Homewood, Illinois, in which police officers questioned the plaintiff, Clifton Thurman, because he was in possession of a gun in the store. Thurman contends that the questioning and detention by the officers deprived him of his freedom of movement in violation of his Fourth Amendment rights and that the Village of Homewood caused the violation of his rights by failing to properly train the officers. He further asserts that the police officers and an attorney acting on their behalf retaliated against him in violation of 42 U.S.C. § 1983 by filing a complaint against him with the Chicago

Police Department, and defamed him in violation of Illinois law. Thurman's lawsuit named the officers, the attorney, and the Village of Homewood as defendants. The district court granted summary judgment in favor of the defendants on the federal claims, and dismissed the state law claim for lack of jurisdiction. Accordingly, we construe all facts along with reasonable inferences in the light most favorable to Thurman. *Fisher v. Lovejoy*, 414 F.3d 659, 661 (7th Cir. 2005).

Thurman was shopping at Home Depot when store employees noticed that he was armed and reported it to the Homewood police. Thurman was dressed in jeans and a sweatshirt, and his clothes did not signal that he was a police officer. Officers of the Homewood Police Department, Robert Misner and Harry Boerema, who are defendants in this action, responded to that call (officers Curt Wiest and Kenneth Strunk subsequently responded as backup.) After speaking with the store's assistant manager, the officers approached Thurman and asked if he was armed. Thurman responded in the affirmative, and stated that he had a "star around [his] neck and credentials in [his] pocket." He then showed the officers his badge, which stated Chicago Police but did not contain any identifying information such as his name or photo. Thurman acknowledged that badges can be stolen, and in fact the fraudulent use of badges has been the subject of media reports as well. *See* Main, Frank and Warmbir, Steve, "Bogus badges: crooks new weapon of choice: From the trivial to the terrible, crimes committed by cop wannabes have exploded in the Chicago area in recent years, an investigation shows", Chi. Sun-Times, p. A16, January 8, 2006 (noting that its investigation revealed that it is easy to obtain a badge and official-looking credentials, including purchasing real badges online). The officers requested additional identification from Thurman, and he produced his driver's license and firearm registration card.

The firearm serial number on the firearm card was whited out and another number was hand-written in its place. Thurman also proffered an identification card that stated Chicago Police Department. The card contained Thurman's photo, but did not indicate that he was a police officer with the department, as opposed to an employee in another capacity. The officers then asked him for his commission card, which is a card issued by police departments that is signed by the police and fire commission and identifies the person as a police officer. Thurman stated that he did not know what a commission card was, to which one of the officers responded that he would know what a commission card was if he was a police officer. Commission cards are issued to Homewood officers, but are apparently not used by the Chicago Police Department.

The officers also asked Thurman for the name of his supervisor and the police district to which he was assigned. When he indicated that he worked for the 21st District, the officers contacted the Illinois State Police District 21 which replied that he was not employed there.

One of the officers who had formerly been employed with the Chicago Housing Authority and had been familiar with the 21st District area, asked Thurman to confirm that there were public housing buildings near the 21st District station. Thurman responded that there was nothing behind the police station. The officer then accused Thurman of lying, stating that he was not actually a police officer.

At that point, the officers, as Thurman put it, "got around to asking" him for the phone number to the 21st District. Thurman then provided it, and the officers promptly called the number to verify that he was an officer there. Upon receiving that verification, they returned the weapon to Thurman and left the store. The entire incident took approximately 20-25 minutes from the initial confrontation to the resolution by Thurman's estimate, or less than 14

minutes according to the police dispatch records from their arrival at the scene to their departure.

Thurman concedes that the officers properly confronted him given the report that he was armed in the store, and that it was appropriate for them to question him to determine whether he was a police officer. He nevertheless contends that the officers unreasonably extended the duration of the investigative stop, thus violating his Fourth Amendment rights. Thurman maintains that the badge and identification that he initially showed the officers was sufficient to confirm that he was an officer entitled to carry a firearm.

In evaluating the reasonableness of an investigation, we consider whether "'the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [person].'" *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005), *quoting United States v. Sharpe*, 470 U.S. 675, 686 (1985). The reasonableness of the detention is determined considering the totality of the circumstances. *Leaf*, 400 F.3d at 1091.

Even taking the facts in the light most favorable to Thurman, there is no basis on which a jury could find a Fourth Amendment violation here. Thurman acknowledges that the stop itself was proper, as he was wearing civilian clothes and carrying a firearm in a store. Thurman produced a badge that had no identifying information, and which could have been stolen or fabricated. Moreover, the firearm registration card that he provided did nothing to dispel that suspicion. The card had been altered in that the firearm serial number was whited out and overwritten with a hand-lettered number. The identification card provided by Thurman revealed that he was an employee of the Chicago Police Department, but did not establish that he was an officer in that department and

therefore entitled to carry a firearm. In order to confirm his status, the Homewood officers continued the inquiry.

One officer familiar with the 21st District at which Thurman claimed to work, questioned him as to the buildings surrounding the police station. That question was another avenue explored to confirm or dispel the suspicion of his status, because a person working at that station would be familiar with the local geography. It failed to clear Thurman only because the Homewood officer's information was outdated. The public housing buildings with which he had been familiar had been razed since he worked at the CHA, and therefore the question did not elicit the expected answer. Moreover, the officers attempted to verify his employment by telephone, but checked with District 21 of the Illinois State Police instead of the 21st District of the Chicago Police Department. There is no allegation that the call to the state police was anything but a mistake. Because it failed to elicit the information that would clear Thurman to carry the firearm, the investigation continued. That misstep does not transform the investigation from a proper one to an unconstitutional one, as the focus is on whether the officers were pursuing a means of investigation likely to dispel or confirm their suspicions.

Moreover, as soon as the officers were provided with the number to the 21st District, they called the number and confirmed that Thurman was an officer. His weapon was then promptly returned and the officers departed.

Thurman has simply failed to produce any evidence that would demonstrate that the officers unreasonably extended the duration of the investigation. All of the actions taken by the officers were designed to elicit information as to whether he was a police officer. Although Thurman believed that they should have accepted his badge and initial tender of identification, they were not constitutionally required to do so. As previously noted, the badge could have been stolen

or fabricated, and that is apparently not an uncommon occurrence. Moreover, the altered firearm card gave the officers more reason to be cautious in making their determination as to his status. Even absent that, however, Thurman failed to present any identification with his name or photo, which identified him as a police officer.

Thurman appears to fault the officers for not "getting around" to asking for the 21st District phone number earlier, stating that he provided the number when they finally got around to asking for it, but there was nothing preventing him from volunteering it earlier to resolve the issue more expeditiously. As it was, the entire incident took a total of 20-25 minutes by Thurman's estimate (which we assume for this appeal). Because all of the questioning and the actions of the officer were likely to yield the needed information regarding his status as a police officer, the investigation did not violate Thurman's Fourth Amendment rights. Accordingly, the district court properly granted summary judgment in favor of the defendant officers on the Fourth Amendment claim. Because Thurman cannot survive summary judgment on the substantive claim against the individual officers, summary judgment was proper for the Village of Homewood on his failure to train claim as well. *See Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003) (in order to recover damages from a municipality under either a failure to train theory or a failure to institute a municipal policy theory, the plaintiff must prove that the individual officers are liable on the underlying substantive claim); *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) (same).

Thurman raises an additional claim, however, stemming from alleged conduct after the encounter at Home Depot by the officers and an attorney acting on their behalf, Gerald Zansitis. According to Thurman's Second Amended Complaint, after learning that they were being sued in this action and with the intent of causing harm to Thurman

because he had complained of their conduct, the officers misused their office as Homewood police officers to persuade Zansitis "to make false and defamatory oral and written statements" intended to prejudice Thurman in his employment with the Chicago Police Department. Thurman alleged that the conduct constituted a conspiracy actionable under 42 U.S.C. § 1983 and defamation in violation of Illinois law. The district court granted summary judgment on the § 1983 claim, holding that Thurman failed to show that the officers acted under color of law. The court chose not to exercise supplemental jurisdiction over the remaining state law defamation claim.

Thurman asserts that his § 1983 claim is essentially one of retaliation by the officers for his decision to file the lawsuit based on the Home Depot incident. A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law.

> For the individual defendants to act "under color of state law" for § 1983 purposes means to "misuse [ ] power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. As a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office."

[citations omitted] *Burrell v. City of Mattoon*, 378 F.3d 642, 649 (7th Cir. 2004), *quoting Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001). A private actor, such as Zansitis, can have acted under color of law if the plaintiff can establish that "(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents." *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th

Cir. 2000). Thurman has failed to provide any evidence from which a jury could conclude that the alleged defamatory conduct was undertaken under color of law. In fact, Thurman has presented no evidence whatsoever in regard to this claim, even failing to identify the defamatory statements, the context in which they were made, or the nature of any communications between the officers and Zansitis. As the district court pointed out, any citizen may file a complaint against any Chicago police officer, Chicago Municipal Code 2-84-430, and it appears that the defamation claim is based upon such a complaint. Therefore, there is nothing in the nature of the complaint that indicates the use of a power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Burrell*, 378 F.3d at 649. Thurman cannot rest upon mere unsupported allegations, but must come forward with some evidence that a genuine issue of fact exists. *Alexander v. City of South Bend*, 433 F.3d 550, 554 (7th Cir. 2006). Thurman has provided no evidence indicating that the defendants acted under color of law, and therefore the court properly granted the defendants' motion for summary judgment.

Finally, Thurman argues that the district court erred in holding that supplemental jurisdiction was not proper over the state law defamation claim because it did not form part of the same case or controversy as the Home Depot incident as required by 28 U.S.C. § 1367(a) for supplemental jurisdiction. We need not address this argument, however, because that was merely an alternative holding of the district court. The court first noted that all federal claims had been dismissed and stated that it chose not to invoke supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). Section 1367(c)(3) assumes that a claim satisfies the same case or controversy requirement of § 1367(a), but grants to the district court the discretion to decline jurisdiction where all federal claims have been dismissed. The

court exercised that discretion, and Thurman raises no argument challenging that determination. Because the court properly declined to exercise supplemental jurisdiction under § 1367(c)(3), Thurman's argument regarding the court's alternative holding is irrelevant.

The decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*